UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| | § | |
| IN RE: ENERGY TRANSFER PARTNERS | § | CIVIL ACTION NO. 4:07-cv-3349 |
| NATURAL GAS LITIGATION | § | |
| | § | |
| | § | |
| | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Plaintiff's Motion for Reconsideration. (Doc. No. 61.)

For the following reasons, Plaintiff's Motion must be denied.

I.      BACKGROUND

This action arises from Defendants Energy Transfer Partners, L.P., Energy

Transfer Company, ETC Marketing, Ltd., and Houston Pipeline Company's allegedly

intentional and unlawful manipulation of the prices of the New York Mercantile

Exchange ("NYMEX") natural gas futures and options contracts between December 29,

2003, and December 31, 2005. (Pl. 2d Am. Compl. ¶ 1, Doc. No. 45.) In separate actions,

the Commodity Futures Trading Commission ("CFTC") and the Federal Energy

Regulatory Commission ("FERC") sued Defendants, alleging attempted commodities

manipulation of physical natural gas prices at the Houston Ship Channel ("HSC").[1]

Defendant Energy Transfer Partners, L.P. ("ETP") is a publicly traded energy

---

[1] The CFTC brought its action in the Northern District of Texas. *CFTC v. Energy Transfer Partners, L.P.* et al, 3:07-cv-1301-K. The CFTC action was dismissed in 2008 pursuant to a Consent Order that contained no conclusions of law or findings of fact. In the Order, Defendants neither admitted nor denied the allegations in the Complaint. The FERC brought an administrative action alleging that Defendants violated the Natural Gas Act and the Natural Gas Policy Act. As of July 2009, the FERC action appears to be in abeyance. (FERC Doc. No. IN06-3-003).

company that owns natural gas pipelines in West Texas, including the Houston Pipeline Company ("HPL") that serves the Houston Ship Channel ("HSC") natural gas market. (Pl. 2d Am. Compl. ¶ 15.) Defendants Energy Transfer Company ("ETC") and Houston Pipeline Company ("HPLC") are subsidiaries of ETP that, among other business interests, buy and sell physical and financial natural gas contracts for ETP, sometimes under the name ETC Marketing, Ltd, also a subsidiary of ETP.

Plaintiffs now bring a class action based on some of the same allegations in the FERC and CFTC complaints. They allege that Defendants sold massive quantities of fixed-price physical natural gas at the Houston Ship Channel ("HSC") in order to lower gas prices to an artificially low level to benefit their physical and financial trading positions.[2] (Pl. 2d Am. Compl. ¶¶ 2, 73.) These artificially low prices allegedly caused the prices of NYMEX natural gas options and futures contracts to trade at artificial levels, frequently on the day the NYMEX natural gas futures contract expired.[3] (Pl. 2d Am. Compl. ¶¶ 51, 79-80.)

Plaintiffs contend that "[b]y manipulating the HSC monthly price index, Defendants intentionally manipulated and caused artificial distortions in NYMEX natural gas futures and options prices." They connect the Defendants' sales at the HSC to the prices of NYMEX futures and options in the following manner. Natural gas market participants use price indexes to inform their decisions to purchase physical and financial natural gas contracts. (Pl. 2d Am. Compl. ¶ 38.) In its *Inside FERC's Gas Market Report* ("*Inside FERC*"), Platts, a division of McGraw Hill Companies, Inc., publishes monthly

---

[2] Most of these trades took place on the Intercontinental Exchange ("ICE"), not the NYMEX. (Pl. 2d Am. Compl. ¶ 32.)
[3] NYMEX uses the Henry Hub as the point of delivery for its natural gas futures contracts. (Pl. 2d Am. Compl. ¶ 22.) Henry Hub is located at Sabine's Henry Gas Processing Plant in Louisiana. (Pl. 2d Am. Compl. ¶ 23.)

the HSC Index price based on market participants' reports of price and volume information for fixed-price sales, over a five-day period at the end of each month, known as bid week.[4] (Pl. 2d Am. Compl. ¶¶18, 33-34.) Plaintiffs detail several incidents in which Defendants purportedly sold natural gas at HSC and reported these sales to Platts' *Inside FERC*. Plaintiffs assert that, "[a]ccording to the CFTC, Platts' indexes 'have a financial impact upon billions of dollars worth of natural gas transactions.'" (*Id.*) The publication of natural gas monthly indexes purportedly affects NYMEX futures contracts in two ways: first, those who purchase physical natural gas execute transactions on the NYMEX to arbitrage the price indexes' valuation differences and, second, traders who use technical analysis to make decisions look at historical physical market price information, including index prices, to determine their trading strategies. (Pl. 2d Am. Compl. ¶ 48.)

Plaintiffs contend that, after they artificially lowered the price of HSC natural gas, Defendants purchased natural gas and benefited by selling financial basis swaps—swaps based on the spread between the NYMEX futures contract[5] price and the HSC index[6] price—for a gain. (Pl. 2d Am. Compl. ¶ 66-69; 73-78.) Plaintiffs contend that, because physical natural gas prices and natural gas futures prices are linked, as described above, Defendants understood that their purportedly manipulative activities at the HSC would

---

[4] Natural gas delivered at the HSC is traded on the Intercontinental Exchange ("ICE"), an electronic trading platform that offers trading in physical natural gas contracts for more than 100 locations. (Pl. 2d Am. Compl. ¶ 53.)

[5] The settlement price of a NYMEX natural gas futures contract is the volume-weighted average price of trades made during the last 30 minutes of trading on the termination day for the next calendar month's contract ("the prompt-month contract") (from 2:00 p.m. to 2:30 p.m. EST). (Pl. 2d Am. Compl. ¶ 24.) The termination day for a NYMEX natural gas contract is the third-to-last business day of the month preceding the prompt month. (*Id.*)

[6] The settlement price of a financial swap is based on the difference between the HSC price index for a given month and the final settlement price of the NYMEX natural gas futures contract for that month. (Pl. 2d Am. Compl. ¶ 61.)

affect NYMEX natural gas futures prices. (Pl. 2d Am. Compl. ¶ 42.) Plaintiffs assert that these manipulations of the HSC market caused intentional manipulation of NYMEX natural gas futures and options during bid week and following the publication of the HSC monthly price index. (Pl. 2d Am. Compl. ¶ 4.)

Plaintiffs claim that Defendants' conduct violated the Commodity Exchange Act ("CEA") and that they and members of a purported class suffered damages by trading NYMEX natural gas futures and options contracts at artificial prices during the relevant period. (Pl. 2d Am. Compl. ¶ 5.) Plaintiff Richard Hershey allegedly purchased a long position[7] in NYMEX natural gas futures on December 30, 2003, and sold this position at a loss the same day. (Pl. 2d Am. Compl. ¶ 13.) Similarly, Plaintiff Roberto E. Calle Gracey purchased a long position in NYMEX natural gas futures on September 27, 2005, and sold that position at a loss the same day. (Pl. 2d Am. Compl. ¶ 14.) Plaintiffs bring manipulation claims under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 13(a), 25(a), and for aiding and abetting violations of the Act. They pray for class certification, damages, prejudgment interest, and litigation fees and costs. This Court has jurisdiction under 28 U.S.C. § 1331.

The Court dismissed Plaintiffs' Complaint for failure to allege that Defendants specifically intended to manipulate NYMEX futures prices or the prices of natural gas at Henry Hub, the commodity underlying the NYMEX futures. Plaintiffs now move the Court to reconsider its decision.

## II.    STANDARD

---

[7] A buyer who is obligated to pay for the commodity and take delivery at the end of the settlement period is on the "long" side of a NYMEX contract. Conversely, the seller who is obligated to receive payment for the commodity and make delivery is on the "short" side.

A motion for reconsideration may be made under either Federal Rule of Civil Procedure 59(e) or 60(b). *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n. 1 (5th Cir. 2004). Such a motion must "clearly establish either a manifest error of law or fact or must present newly discovered evidence.  These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005) (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).  In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). Plaintiffs timely filed their Motion for Reconsideration pursuant to 59(e). *See* FED. R. CIV. P. 6.

## III.   ANALYSIS

Plaintiffs contend that the Court improperly dismissed the Complaint by erroneously resolving disputed issues of fact. Specifically, the Court mistakenly dismissed Plaintiffs' Complaint on the ground that Plaintiffs failed to plausibly allege that Defendants "intended to create an artificial NYMEX price." They contend that the Court impermissibly concluded that Defendants could not have plausibly intended to manipulate NYMEX prices in light of the Complaint's allegations that Defendants attempted to ensure that the HSC index would artificially settle lower relative to the settlement price of the NYMEX contract. Plaintiffs submit the affidavit of a Dr. Michael Harris of the Harris Economics Group to support their claims that the scenario presented by their Complaint is plausible.

## IV.   PLAINTIFFS' MOTION FOR RECONSIDERATION

### 1. Standard for a Manipulation Claim

Plaintiffs agree that the Court enunciated the proper standard for a CEA market manipulation claim. The CEA establishes a violation for market manipulation when (1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial prices; and (4) the defendant specifically intended to cause the artificial price. 7 U.S.C. § 13(a); *In re Amaranth Natural Gas Commodities Litigation* ("*Amaranth*"), 587 F.Supp.2d 513, 530 (S.D.N.Y. 2008); *In re Natural Gas Commodity Litigation* ("*Natural Gas I*"), 337 F.Supp.2d 498, 507 (S.D.N.Y. 2004); *In re Crude Oil Commodity Litigation*, No. 06 Civ. 6677(NRB), 2007 WL 19465553, *3 (S.D.N.Y. June 28, 2007); *CFTC v. Enron Corp.*, C.A. No. H-03-090, 2007 WL 594752, *4 (S.D. Tex. Mar. 10, 2004).

Manipulation is "an intentional exaction of a price determined by forces other than supply and demand" and the means of manipulation "are limited only by the ingenuity" of humankind. *CFTC v. McGraw-Hill Companies, Inc.*, 507 F.Supp.2d 45, 51 (D.D.C. 2007); *United States v. Reliant Energy Servs.*, 420 F.Supp.2d 1043, 1056 (N.D. Cal. 2006); *In re Sumitomo Copper Litigation*, 182 F.R.D. 85, 90 (S.D.N.Y. 1998); *CFTC v. Enron Corp.*, No. H-03-909, 2004 WL 594752, *4 (S.D.Tex. Mar. 10, 2004) (citing *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991); *Cargill Inc., v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971)). The difference between a legitimate transaction and market manipulation need not be a misstatement or omission, but must be a transaction that involves something more that suggests that the transactions were intended to send an improper market signal. *See Amaranth*, 587 F.Supp.2d at 534. Manipulative acts in places other than the delivery point for the commodity underlying a futures contract may give

rise to claims that futures contract prices have been manipulated. *See In re Sumitomo Copper Litigation* 182 F.R.D. 85, 85-94 (S.D.N.Y. 1998) (allowing a class to proceed based on allegations that commercial copper dealers held long positions on the London Metal Exchange and hoarded copper in exchange warehouses such that the price of copper on the U.S.-based COMEX became artificial). *See also In re Natural Gas Commodities Litigation ("Natural Gas II")*, 235 F.R.D. 241, 247 (S.D.N.Y. 2006) (holding that, for purposes of a motion to compel, trade data from physical natural gas trading locations were relevant to a claim of manipulation of the natural gas futures market).

In order to state a manipulation claim, the plaintiffs must allege that defendants both intentionally acquired the ability to manipulate prices and exercised that ability to cause artificial prices. *See Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58-59 (5th Cir. 1962); *Kohen v. Pacific Investment Management Co. LLC*, 244 F.R.D. 469, 484 (N.D. Ill. 2007) (holding that the plaintiffs adequately stated a claim for manipulation, including the element of intent, when it could be inferred that defendants intended to cause an artificial price when they sold their entire position in the commodity in one day, after purportedly accumulating the notes as an investment).

### 2. Level of Intent Required

The parties dispute the proper definition of "specific intent" for purposes of the CEA. Plaintiffs contend that manipulation of NYMEX natural gas futures and options contracts was a direct, proximate, and foreseeable result of Defendants' unlawful conduct. They aver that, under the CEA, Plaintiffs need not allege that Defendants sought to manipulate futures prices; they need only allege that the manipulation of NYMEX

futures prices was a direct, proximate, and foreseeable result of Defendants' unlawful conduct. Defendants respond that this "direct, proximate, and foreseeable" intent standard is incorrect and that the proper standard is specific intent.

Plaintiffs note that the Complaint contains numerous allegations that Defendants intended to manipulate NYMEX natural gas futures and options and contend that the Court improperly resolved disputed issues of fact. Defendants respond that they never disputed that the Complaint facially alleges intent to manipulate NYMEX prices but rather that its facts are restricted to an intent to "suppress fixed price gas at HSC." Plaintiffs contend that "Defendants understood that their manipulative activities in the HSC market would be transmitted to and affect NYMEX natural gas futures prices." (Compl. ¶ 44.)

The Court based its previous Order on principles recently affirmed by the Supreme Court that "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. [W]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations...." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (May 18, 2009).

Courts have several formulations of the intent required for a CEA violation. Several Southern District of New York courts evaluate the intent prong using the Rule 9(b) requirements for averring fraud. *See In re Crude Oil Commodity Litigation*, No. 06 Civ. 667(NRB), 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007) (describing the "requisite strong inference of fraud to be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.").[8] Another New York court described the same standard for the specific intent element with reference to securities violation claims. *Amaranth*, 587 F.Supp.2d 513, 530 (S.D.N.Y. 2008) ("The specific intent to cause a market distortion, scienter, can be pled by 'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'") (internal citations omitted). *See ATSI Commc'nc v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d. Cir. 2007) (discussing recklessness in the securities fraud context).[9] *See also In re Crude Oil Commodity Litig.*, 2007 WL 1946533, at \*7 n.5 (noting that the Supreme Court decision in *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 326 (2007) describing the appropriate standard for scienter in the securities fraud context may have some bearing on adequately pleading intent in the CEA context).

A sister court has explained that, to succeed in establishing the intent element of attempted manipulation, the Government must show that defendants "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *CFTC v. Johnson*, 408 F.Supp.2d 259, 267 (S.D. Tex. 2005) (citing *In re Indiana Farm Bureau Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. Law Rep. (CCH) ¶ 21,796, 27,288 n. 2 (CFTC Dec. 17, 1982)); *CFTC v. Enron*, 2004 WL 594752, at \*7 (S.D. Tex. Mar. 10, 2004) (citing *In re Indiana Farm Bureau*). The *Johnson* court found that the

---

[8] The *Crude Oil Litigation* court dismissed the complaint because it found that plaintiffs had only alleged that the defendants had a large presence in the Cushing, Oklahoma crude oil market as well as the NYMEX futures and options market and they stood to gain large profits by manipulating crude oil prices. These allegations were insufficient to allow the Court to find a strong inference of scienter.

[9] Likewise, in the Fifth Circuit, securities fraud scienter can be established with intent or severe recklessness and may be based on circumstantial evidence. *Fin. Acquisition Partners LP*, 440 F.3d 2718, 286 (5th Cir. 2006); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003).

trader-defendants intended to affect the price of physical natural gas in interstate commerce by submitting biased trade information to *Inside FERC*, among other reporting firms for at least nine locations. *Id.* at 264, 268. The CFTC alleged that, had the trader-defendants' manipulation of the physical natural gas market been successful, it could have affected the price of natural gas and the price of natural gas futures and option contracts on NYMEX.[10] *Id.* The Court held that, "the facts, as alleged indicate that the trader-defendants intended to affect the price of physical natural gas in interstate commerce by submitting reports that contained biased information to the reporting firms." *Id.* at 268. The *Johnson* Court did not conclude that the defendants intended to manipulate the price of NYMEX futures—the case involved the manipulation of the underlying physical natural gas market. *See also CFTC v. Reed*, 481 F.Supp.2d 1190, 1200 (D. Colo. 2007) (denying a motion to dismiss because the CFTC adequately alleged that the defendant provided market information concerning natural gas to reporting firms in an attempt to manipulate the price of natural gas and then detailed several telephone conversations involving the false reporting scheme).[11] In dicta, a sister court explained that, while the Government did not allege a manipulation claim:

> To the extent [defendant] argues as a factual or a legal matter that West Coast transactions of natural gas are not covered by § 13(a)(2) [manipulation claim], the Court disagrees. [T]he fact that West Coast

---

[10] The defendants involved in *CFTC v. Johnson* settled with the CFTC except Anthony Dizona. Eventually Judge Kenneth Hoyt set aside a jury verdict in favor of the CFTC because it found insufficient evidence of "specific intent" to support the jury's verdict. In setting aside the verdict, Judge Hoyt explained "The term 'specific intent' describes a particular *mens rea*. Generally, the term 'willfully' defines an act as committed voluntarily and purposely, with the 'specific intent' to do something the law forbids—with bad purpose either to disobey or disregard the law." Judge Hoyt explained that the jury did not find that Dizona knowingly delivered false or inaccurate reports concerning market information to the reporting services. *CFTC v. Johnson*, C.A. No. 05-332, Order of April 24, 2008, at 6-8 (S.D.Tex. April 24, 2008).

[11] In a criminal case involving the manipulation provision, a district court has explained "[T]he criminal manipulation provision prohibits defendants from engaging in intentional conduct aimed at preventing the basic forces of supply and demand from operating properly. Thus, the criminal manipulation provision is concerned less with the price itself than it is with the process by which the price is set." *United States v. Reliant Energy Services, Inc.*, 420 F.Supp.2d 1043, 1057-58 (N.D. Cal. 2006).

> contracts are not generally traded on the futures exchanges does not take Valencia's conduct outside of the coverage of § 13(a)(2).... Further, [defendant's] argument that West Coast gas is not traded on the futures market amounts to a challenge to the Government's proof that the allegedly false prices reported to *Inside FERC* did not affect the futures market. This is a factual matter not presented in the charges against Valencia at this time. Even if a charge under the manipulation prong of § 13(a)(2) were brought, any issue of the effect of [defendant's] conduct would be a factual issue requiring a trial, not grounds for pre-trial dismissal of the charge as a matter of law.

*United States v. Valencia*, No. Civ. A H-03-024, 2003 WL 23174749, at *22 (S.D. Tex. 2003), *rev'd on other grounds*, 394 F.3d 352 (5th Cir. 2004). The *Valencia* court distinguished the "knowingly" standard for claims based on false reporting from the intent to manipulate the market mens rea standard for manipulation claims. *See* 2003 WL 23174749, at *19. Again, while the *Valencia* court notes that the plaintiff need not prove actual manipulation of futures prices for the purposes of a motion to dismiss, it does not excuse the plaintiff from alleging facts to suggest that that plaintiff intended to manipulate the futures or underlying Henry Hub natural gas market.

Plaintiffs cite Black's Law Dictionary's definition of "intend" to provide an alternative definition of intent. BLACK'S LAW DICTIONARY 881 (9th ed. 2009) (defining "intend" as "2. [t]o contemplate that the usual consequences of one's act will probably or necessarily follow from the act, whether or not those consequences are desired for their own sake"). The Court notes that, on the following page, the dictionary defines specific intent: "The intent to accomplish the precise criminal act that one is later charged with"; and general intent: "The intent to perform an act even though the actor does not desire the consequences of that result." The definition of general intent describes it as typically of the form of recklessness or negligence—and is applicable when specific intent is not required for the commission of particular crimes. BLACK'S LAW DICTIONARY 882 (9th ed.

2009). As discussed above, the standard for CEA specific intent appears to involve an intent to influence the precise market manipulation of which the defendants are accused—here the NYMEX futures market or the underlying Henry Hub natural gas market.

Instead, Plaintiffs allege that Defendants' trading activity that depressed the HSC price index: "caused and resulted" in intentional manipulation of NYMEX natural gas futures and options (Pls. 2d  Am. Compl. ¶ 4); or futures and options manipulation "was a direct, proximate and foreseeable result of Defendants' unlawful conduct" (*Id.* at ¶ 5). In other parts of the Second Amended Complaint, Plaintiffs describe that "[b]y using sophisticated models that employed price index information, natural gas market participants would necessarily have their NYMEX natural gas trading decisions impacted by price index information." (*Id.* at ¶ 44.) Furthermore, these depressed index prices "cause market participants to initiate or offset NYMEX natural gas positions they would not have executed but for the artificial price index." (*Id.*) Plaintiffs further describe that the monthly price indexes "caused NYMEX natural gas futures and options prices to immediately move on the second business day" (*Id.* at ¶ 46); "immediately impacts [the NYMEX price]" (*Id.* at ¶ 47); are used by technical traders to determine NYMEX natural gas trading strategies (*Id.* at ¶ 48). Plaintiffs allege that Defendants intentionally sold massive quantities of fixed-price, physical natural gas for delivery at HSC and that this manipulative conduct "had an immediate effect on the price of NYMEX natural gas futures and options contracts because the artificial prices of the physical natural gas being sold by Defendants at HSC became immediately known to all industry participants since the price and volume information was displayed on the ICE terminals." (*Id.* at ¶ 56.)

While all of these statements allege a causal relationship between Defendants actions and the effect on NYMEX futures and options, they do no not allege facts that allow the reasonable inference that Defendants intended to affect the prices on the exchanges. Rather, applying the *Johnson* intent standard above, Plaintiffs succeed in alleging that Defendants intended to cause or effect a price or price trend in the HSC physical gas market that did not reflect the legitimate forces of supply and demand market prices. In addition, with reference to the securities/fraud standard for intent discussed above, Plaintiffs allege, for example, ETP "intentionally sold natural gas at artificially low, non-competitive positions which were below levels suggested by objective reference points, such as Henry Hub … to benefit its natural gas physical and financial trading positions." (Pl. 2d. Am. Compl. ¶ 73.) Plaintiffs allege that Defendants benefited by selling financial basis swaps—swaps based on the spread between the NYMEX futures contract price and the HSC index price—for a gain. (Pl. 2d Am. Compl. ¶ 66-69; 73-78.) Consequently, while Plaintiffs' allegations give rise to the inference that Defendants had no motive to decrease natural gas futures prices through their downward manipulation of the HSC market because it would be contrary to their financial interests.

The Court notes that *Natural Gas I* denied a very similar motion to dismiss because "Defendants' arguments that Plaintiffs' … allegation of specific intent is insufficient … are more properly made in a motion for summary judgment rather than a motion to dismiss." 337 F.Supp.2d at 508. The court appeared to base its decision on the liberal pleading standards of Federal Rule 8(a) and the fact that the CFTC and FERC were investigating much of the same conduct alleged in the Complaint, such that defendants would be on notice of the claims against them. The *Natural Gas I* court

applied the then applicable "no possible set of facts" standard, now rejected in *Ashcroft v. Iqbal*. Although the Court notes the similarities between the two cases, it finds the instant case distinguishable both because the pleading standard has changed and because the scheme there was based on false reporting by defendants who were major participants in the physical natural gas market as a whole, rather than focused on the HSC market.

### 3. Defendants' Scheme

In addition, Plaintiffs reiterate their contention that Defendants' scheme lowered both the HSC Index price and the NYMEX contract price. Plaintiffs submit an expert report that explains that a significant price shock at HSC would both widen the spread between HSC and Henry Hub (the natural gas contract associated with the NYMEX natural gas futures) as well as drive down Henry Hub. Plaintiffs' expert contends that "it is not a matter of 'whether' such activity at HSC impacted NYMEX prices it is a matter of 'how much.'" *Id.* at ¶ 5. Defendants respond that the expert affidavit, it if it is considered, ultimately concludes that the author is aware of no analysis that finds that a price shock at HSC could not impact prices at Henry Hub and prices for NYMEX futures contracts and options. They contend that affidavit does not therefore establish that Plaintiffs' claims  plausibly allege a specific intent to manipulate the futures market. As both parties note, the affidavit is not properly considered on a motion to dismiss, and the Court will not consider it here.

### 4. Leave to Amend

Plaintiff also requests leave to amend. For the reasons stated in the prior order, leave to amend shall be denied.

## V. FURTHER EXPLANATION OF ARGUMENTS RAISED IN THE CONTEXT OF THE MOTION TO DISMISS

Defendants note that they provided several other grounds to dismiss Plaintiffs' Complaint including: the lack of allegations as to how prices at HSC could drive NYMEX prices to an artificial level; a lack of a causal link between Plaintiffs' alleged intra-day trading losses and Defendants' alleged conduct; the incongruity between the dates on which Plaintiffs allegedly bought and sold futures contracts and the dates of the alleged manipulation; the lack of allegations that Defendants possessed the power to influence NYMEX natural gas futures contracts; failure to plead with particularity required by FED. R. CIV. P. 9(b); and Plaintiffs' failure to plead facts demonstrating their standing to bring the case.

### A. Failure to Plead Fraud With Particularity

Defendants assert that the essence of Plaintiffs' claims sound in fraud such that they must follow the heightened pleading standard of Rule 9(b). Citing cases such as *Crude Oil*, *infra*, Defendants claim that Plaintiffs must specify what manipulative acts were performed, which party performed them, when they were performed, and what effect the scheme had on the market for the futures contracts at issue. *See In re Crude Oil Commodity Litigation*, No. 06 Civ. 6677(NRB), 2007 WL 1945553, *6 (S.D.N.Y. June 28, 2007) (holding that, even though 9(a)(2) of the CEA does not include an element of fraud, Rule 9(b) applies on a case-by-case basis and the facts in the complaint sounded in fraud such that Rule 9(b) pleading was required). Defendants assert the contrary cases, *Enron* and *Johnson*, were decided prior to recent cases that apply 9(b) to private manipulation cases. They contend that these cases were also contrary to the general principle that Rule 9(b) applies to all averments of fraud, whether part of the claim or not.

Plaintiffs distinguish *Crude Oil* and *Natural Gas II* as cases that rely on false

transactions to index publishers or false representations to the market, unlike the conduct of Defendants here. They argue that, like *Amaranth*, the Second Amended Complaint does not raise an inference of deception. *See CFTC v. Amaranth Advisors, LLC*, 554 F.Supp.2d 523, 535 (S.D.N.Y. 2008); *see also*, *In re Amaranth Natural Gas Commodities Litigation*, 587 F.Supp.2d at 535 (requiring fraud to be pled with particularity in a CEA manipulation case because, reasoning by analogy to securities act cases, market manipulation is inherently deceptive); *In re: Natural Gas Commodity Litigation*, 358 F.Supp.2d 336, 342-43 (S.D.N.Y. 2005) ("*Natural Gas II*") (requiring fraud to be pled with particularity because the plaintiffs alleged dissemination of inaccurate, misleading, and false trading information).[12]

Here, Plaintiffs plead several facts that raise an inference of deceptive activity. For example, Plaintiffs claim that ETP "engaged in a circuitous process of first selling the gas at a fixed price to suppress the [*Inside FERC*] HSC index and then buying the gas back at reduced levels" rather than transporting the gas directly. (2d. Am. Compl. ¶ 102.) In other sections of the complaint, Plaintiffs allege that Defendants "dumped" gas on the market in a "scheme" to depress prices. (*Id*. at ¶¶ 89, 134.) In addition, after the parties filed the briefing for this Motion, a Southern District of New York court held that manipulation is inherently deceptive such that fraud must be pled with particularity. *See*

---

[12] Other cases cited by the parties failed to reach the issue, declined to apply Rule 9(b) because there was no precedent doing so, or relied on cases that failed to reach the issue. *CFTC v. Atha*, 420 F.Supp.2d 1373, 1381-82 (N.D. Ga. 2006) (citing conflicting authority and concluding that even if Rule 9(b) applied to § 13(a)(2), the plaintiffs have met their burden); *CFTC v. Enron*, C.A. No. H-03-909, 2004 WL 594752, *3 (S.D. Tex. Mar 10, 2004) (manipulation need not be pled with particularity, citing, without discussion, *Three Crown Ltd. Partnership*, 817 F.Supp. 1033 (S.D.N.Y. 1993), in which the court declined to reach the issue); *CFTC v. Johnson*, 408 F.Supp.2d 259, 270 (S.D. Tex. 2005) (holding that Rule 9(b) does not apply because defendants failed to cite any authority for the proposition that it does); *Premium Plus Partners, L.P. v. Davis*, No. 04 C 1851, 2005 WL 711591, *14 (N.D. Ill. 2005) (holding that Rule 9(b) does not apply to a manipulation claim because the defendants failed to cite any law in favor of the proposition and because the specific manipulation claim was not premised on allegations of fraud).

*Amaranth*, 587 F.Supp.2d at 535. It is unclear whether this subsequent case marks a break with the Southern District of New York's previous case-by-case analysis of the need to specifically plead fraudulent acts to establish a CEA manipulation claim. Regardless, however, of the standard applied, the Court concludes that Plaintiffs have failed to state a claim.

### B. Loss Causation As a Necessary Element of a Private CEA Claim

Defendants argue that Plaintiffs failed to allege that they suffered an economic loss as a result of Defendants' alleged price manipulation. Plaintiffs respond that that they do not need to establish that Defendants' scheme caused Plaintiffs' damages, but only that Defendants' scheme caused the prices to be artificial at the time Plaintiffs traded.

The parties dispute whether a recent Supreme Court case requires Plaintiffs to plead loss causation. In *Dura Pharmaceuticals, Inc. v. Broudo*, the Supreme Court resolved a circuit split by holding that, in order to plead a Securities Exchange Act 10(b)-5 private securities fraud action, a plaintiff must not only allege that the price on the date of purchase was inflated because of the defendant's misrepresentation, but also that the misrepresentation caused the plaintiff's loss. 544 U.S. 336, 343-44 (2005). The Supreme Court reasoned that a plaintiff is not necessarily harmed at the moment that he purchases a security at an artificially inflated price because, at that moment, "the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." 544 U.S. at 342.

Courts have inconsistently applied *Dura* outside the private securities context. *See Wilson v. Kimberly-Clark Corp.*, 254 Fed. Appx. 280, 283-85, n. 23 (5th Cir. 2007) (not designated for publication) (applying *Dura* in the context of ERISA litigation); *but see In*

*re Cardinal Health, Inc. ERISA Litigation*, 424 F.Supp.2d 1002, 1043 (S.D. Ohio 2006)
(declining to apply the *Dura* loss causation requirement to a breach of fiduciary duty
claim under ERISA based on the lack of authority on the issue and the different pleading
standards applicable to fraud and breach of fiduciary duty).[13]

The Northern District of Illinois specifically declined to apply *Dura* to a CEA
claim. *Kohen*, 244 F.R.D. at 475 (declining to apply *Dura* to determine whether
purported class members were injured for purposes of a CEA manipulation claim, and
deciding that the class members had alleged loss because they asserted that they
purchased the contracts at an inflated price).[14] The *Kohen* court noted that loss causation
is not an element in a CEA manipulation claim and found that all the class plaintiffs had
alleged injury because they paid a price higher than otherwise would have been the case
absent the alleged manipulation. *Id.*

As noted above, courts look to securities law to interpret the anti-fraud provisions
of the CEA. *See FDIC v. UMIC, Inc.*, 136 F.3d 1375, 1384 n.4 (10th Cir. 1998). Several
courts in the Southern District of New York and elsewhere have cited caselaw from the
securities context to interpret other elements of a private anti-fraud CEA claim. More
recently, the *Amaranth* court applied securities law to interpret a manipulation claim, by
holding that manipulation is inherently deceptive. 587 F.Supp.2d at 535.

---

[13] Plaintiffs also cite two cases for the proposition that other courts have described *Dura* as a narrow holding—these cases do not significantly advance either party's argument. *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 265 n.16 (5th Cir. 2007) ("Essentially, we require plaintiffs to establish loss causation in order to trigger the fraud-on-the-market presumption… Our approach [for addressing a securities act 10b-5 claim] is unaffected by the Supreme Court's recent and very narrow decision in [*Dura*]"); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 439 F.Supp.2d 692, 700 (S.D. Tex. 2006) ("Thus the high court addressed a narrow issue: it held that in a fraud-on-the-market case a plaintiff must plead, and ultimately prove, more than simply that the defendant's misrepresentation caused the stock price to be inflated").

[14] Other courts have declined to extend *Dura's* holding to fraud related to assets with intrinsic value, by explaining that artificially inflated prices on fungible assets like securities have a different effect on the holder than do inflated prices for the purchase of a business. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181-83 (2d Cir. 2007).

To plead a claim for relief under the Securities Exchange Act of 1934, the plaintiffs must plead loss causation, or a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Brodo*, 544 U.S. 336, 342   (2005); *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314 (5th Cir. Sept. 8, 2008) (not designated for publication). The plaintiffs must allege that the market responded negatively to a corrective disclosure; confirmatory information, information already known to the market, may not constitute a corrective disclosure. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004). That is, the plaintiffs must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal a "facially plausible causal relationship between the alleged fraudulent statements or omissions and plaintiff's economic loss, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*, 565 F.3d at 258 (citing *Dura* and *Twombly*) (holding that statements related to churn and involuntary disconnection problems with its sub-prime credit classes were plausibly related to the alleged misstatements regarding the benefits of programs promoting sales to sub-prime credit classes). The Fifth Circuit does not prevent a plaintiff from alleging loss causation based on the partial or indirect disclosures of the truth, or disclosures by persons other than the defendants. *Lormand*, 565 F.3d at 261-63 (relying on disclosures by corporations involved in the same business, disclosures by the parent corporation, reports of expert stock analysts, and the defendant's discussion of the failures of the business program about which the defendant made material misrepresentations). Moreover, the disclosure need not reveal that previous information was fraudulent, only that it was wrong. *Alaska Electrical Pension*

*Fund v. Flowserve Corp.*, 572 F.3d 221, 231-32 (5th Cir. 2009) (distinguishing the requirements for alleging loss causation from the requirements for alleging scienter).

Part of Plaintiffs' concern that *Dura* does not apply to CEA cases rests on the different elements of proof required in each case. A private securities act case includes elements of loss and causation, whereas the elements of a CEA manipulation claim as prosecutable by the CFTC, does not. In order to allege a private cause of action under the CEA, however, Plaintiffs must allege causation and damages. *See Amaranth*, 587 F.Supp.2d at 530 n. 104 ("Any person ... who violates this chapter ... shall be liable for actual damages resulting from one or more of the transactions." 7 U.S.C. § 25(a)). *Accord Marshall v. Green Giant Co.*, 942 F.2d 539, 544 (8th Cir. 1991) ("In 1982, Congress amended the CEA by allowing a private right of action for anyone suffering actual damage as a result of a violation of any portion of the CEA."); *North Cent. F.S., Inc. v. Brown*, 951 F.Supp. 1383, 1403 (N.D. Iowa 1996).

It is difficult for the Court to conclude that, regardless of whether it is proper to import wholesale the reasoning of *Dura* to the CEA, Plaintiffs have alleged damages from their purchase of futures contract that plausibly relate to Defendants' conduct. Plaintiffs argue that they plead that Defendants, in their manipulation of the HSC Index, could have driven down the price of the NYMEX such that it was also artificial both during bid week (before the publication of *Inside FERC*) and afterwards. Consequently, Plaintiffs' harm arises from having allegedly traded in an artificial market, however briefly. In their Complaint, Plaintiffs explain that natural gas indexes affect NYMEX natural gas futures price through traders' use of *Inside FERC* monthly price indexes. (Pl. 2d Am. Compl. ¶¶ 42-45.) They note that "[t]he publication of the natural gas monthly

indexes on the first day of the month ... [including *Inside FERC*] immediately impacts what is then the prompt-month [NYMEX] futures contract, expiring at the end of the month." (Pl. 2d Am. Compl. ¶ 47.) Plaintiffs thereby allege that the connection between NYMEX and the physical natural gas price at the various gas terminals operates through the publication of the indexes that occurs on the first of the month.

Hershey allegedly purchased a long position in NYMEX natural gas futures on December 30, 2003, and sold this position at a loss the same day. Similarly, Gracey purchased a long position in NYMEX natural gas futures on September 27, 2005, and sold that position at a loss the same day. Plaintiffs allege that they were "damaged as a direct result of Defendants' manipulation of the prices of NYMEX natural gas futures contracts to artificial levels." (Pl. 2d Am. Compl. ¶¶ 13-14.) They also allege that "the prices of NYMEX natural gas futures and options contracts during the Class Period have been manipulated to artificial levels, and Plaintiffs and other members of the Class have been damaged by these artificial prices." (*Id.* ¶ 144.) As Defendants assert, however, *Inside FERC* publishes the HSC Index at the beginning of each month. (Pl. 2d Am. Compl. ¶ 87.) Consequently, assuming that Defendants dumped gas on the HSC market in late December 2003 or September 2005 (Pl. 2d Am. Compl. ¶ 69), and assuming that the NYMEX futures price is highly correlated with these indexes, the HSC Index was not published until after Gracey and Hershey sold their futures contracts.[15] Plaintiffs' bare allegations that Defendants intentionally began manipulating prices of NYMEX natural gas futures contracts do not give rise to a plausible inference that Defendants' actions

---

[15] Defendants note that Plaintiffs did not allege the price differential for the futures contract they held and do not specify which futures contract is at issue. Plaintiffs state that the HSC Index affected futures prices throughout the month and, accordingly, they argue that even if Plaintiffs purchased their futures contract near the end of the month, market was still artificial. (Pl. 2d Am. Compl. ¶ 4.) Plaintiffs' argument does not raise their allegations above the level required for a plausible private CEA claim.

affected futures prices such that Plaintiffs suffered a loss sufficient to state a CEA claim. More importantly, the relevant HSC Index was not published during the time that Plaintiffs held their futures contract such that the price was manipulated while they held the contract. Without more, this connection is too implausible to state a claim.

A judge in the Southern District of New York denied a motion to dismiss on a very similar manipulation claim on the basis that the defendants impermissibly moved to dismiss because of plaintiffs' failure to establish a causal link between the defendants' alleged misconduct and the plaintiffs' damages from trading natural gas futures on NYMEX. *Natural Gas I*, 337 F.Supp.2d at 508-09. At the time, however, the district court was guided by the Second Circuit's use of the "no set of facts" motion to dismiss standard, which is now unavailable in light of the Supreme Court's holding in *Iqbal*; in addition, the case was decided pre-*Dura*. *See, e.g. Dura*, 544 U.S. at 347 ("[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."). *Amaranth*, another private class action based on manipulation of natural gas markets, involved manipulation of the NYMEX Futures market directly and therefore, Plaintiffs' losses on futures contracts and the manipulation occurred in the same market. 587 F.Supp.2d at 519-526.

### C. Aiding and Abetting

Defendants argue that Plaintiffs' assertions do not contain any factual allegations that give rise to an inference that Defendants rendered substantial assistance to any Defendant with the specific intent to manipulate NYMEX futures contracts or Henry Hub prices. Under the CEA, to state a claim for aiding and abetting, the plaintiffs must allege

that the defendants (1) had knowledge of the principal's intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective. *See, e.g. Kohen v. PIMCO*, 244 F.R.D. at 482; *CFTC v. Johnson*, 408 F.Supp.2d at 268 (holding that the CFTC's allegations that a defendant circulated a e-mail containing false and biased information concerning natural gas transactions supported an aiding and abetting claim).

Plaintiffs respond that they have sufficiently alleged that Defendants provided substantial assistance in their joint scheme to manipulate physical natural gas and futures and options prices. They allege that the subsidiary defendants bought and sold physical gas at ETP's direction that ETP pushed HSC physical prices down, that traders for HPLC and ETC Marketing acted in concert to coordinate trading activity and share profits between trading desks for the benefit of ETP, among other actions. Defendants reply that Plaintiffs' Complaint is deficient because it does not contain factual allegations that give rise to allegations that particular Defendants rendered substantial assistance to any other Defendant with the specific intent to manipulate Henry Hub or NYMEX futures contract prices. For the reasons that the Court finds the allegations of specific intent insufficient as described above, it concludes that Plaintiffs have also failed to allege an aiding and abetting claim.

### D. Statute of Limitations Under CEA, 7 U.S.C. § 25(c)

A private action for price manipulation must be brought not later than two years after the date the cause of action arises. 7 U.S.C. § 25(c). A claim arises under the CEA when the plaintiffs are put on inquiry notice of a potential claim. *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994); *Kolbeck v. LIT America, Inc.*, 923 F.Supp.

557, 564 (S.D.N.Y. 1996). Defendants claim that this provision bars actions on trades prior to September 28, 2005 because Plaintiffs failed to exercise due diligence in pursuing their claims and they did not properly allege that Defendants concealed the violation. Plaintiffs respond that Defendants' manipulation was self-concealing and, if not, they sufficiently plead concealment such that Defendants can prepare their defense.

In order to toll the applicable statute of limitations based on fraudulent concealment, a plaintiff must allege (and later prove) that (1) the defendants concealed the existence of the violation and (2) the plaintiff, despite due diligence, failed to discover the facts that form the basis of his claim. *See Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1528 (5th Cir. 1988); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008); *Natural Gas I*, 337 F.Supp.2d at 513. A plaintiff may show concealment by showing either that the defendants took affirmative steps to prevent the plaintiff's discovery of his claim or injury or by showing that the wrong itself was of such a nature to be self-concealing. *Allan Constr.*, 851 F.2d at 1529-30; *Natural Gas I*, 337 F.Supp. at 513. For example, the Fifth Circuit held that, where the defendant had conducted covert meetings and submitted affidavits that denied collusion, the plaintiff had possibly provided sufficient evidence of concealment, even if it was questionable that reliance on these affidavits was reasonable given that a federal investigation into defendants' conduct had begun. *Texas v. Allan Construction Co.*, 851 F.2d at 1532-33.

Allegations of fraudulent concealment must satisfy the Rule 9(b) requirements. *See Frith v. Guardian Life Ins. Co. of Am.*, 9 F.Supp.2d 734, 742 (S.D. Tex. 1998); *In re Issuer Plaintiff IPO Antitrust Litig.*, No. 00 Civ. 7804(LMM), 2004 WL 4872222, at *3 (S.D.N.Y. Mar. 12, 2004). Plaintiffs contend that the *Frith* case explains that Rule 9(b)

and 8(a) are complementary and therefore the specificity of the allegations of fraudulent concealment should be judged based on whether defendants are on notice that the manipulation is claimed to be self-concealing.

The *Frith* court explained that while a complaint need not state all facts pertinent to a case to satisfy Rule 9(b), pleading fraud with particularity does require a plaintiff to plead the time, place and contents of the alleged false representations. *See Frith*, 9 F.Supp.2d at 742. *See also Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *U.S. v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (noting that the plaintiff must plead the "who, what, when, where, and how" of the alleged fraud.) For allegations of fraud, FED. R. CIV. P. 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

### 1. Whether a CEA Manipulation Claim is Self-Concealing

Plaintiffs contend that whether unlawful conduct is self-concealing is an issue of fact not properly resolved on a motion to dismiss. They also contend that, when Defendants reported price and volume information, their identities were not publicly reported. In addition, when Defendants reported the price and volume information, they did not reveal that they were participating in a secret scheme to unlawfully manipulate the HSC market. Plaintiffs claim that Defendants' misconduct was only disclosed when the CFTC sued Defendants for attempted price manipulation, in July 2007.

Defendants contend that their purported conduct was not, by its nature, self-concealing. They argue that the logical conclusion of Plaintiffs' reasoning is that the

statute of limitations would be tolled for every private CEA price manipulation case. Defendants contend that this case is distinguishable from *Natural Gas I* in which the court held a manipulation scheme based on reports of false data and fraudulent wash trades was inherently self-concealing. 337 F.Supp.2d at 498. Defendants note that their trading activities occurred on the open market and were accurately reported to *Inside FERC*.

As noted, if the wrong is self-concealing, the plaintiff does not need to show affirmative acts. "A 'self-concealing' wrong is one in which deception is an essential element for some purpose other than merely to cover up the act." *Allen Constr.*, 851 F.2d at 1530-31 (citing *Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984)). In *Allen Constr.* the Fifth Circuit disagreed with other circuits and held that bid-rigging was not inherently self-concealing.

*Natural Gas I* held that the plaintiffs had adequately alleged fraudulent concealment where they alleged that they had no knowledge of the unlawful conduct until the Lieutenant Governor of California filed a lawsuit against several of the defendants. 337 F.Supp.2d at 514. In addition, the plaintiffs alleged "the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure." *Id*. The court relied heavily on *Issuer Plaintiff* (discussed *infra*) to conclude that, because allegations that a plaintiff was placed on inquiry notice are often sufficient to raise a fact dispute, the motion to dismiss should be denied. *Id*. In addition, the court rejected the defendants' claim that plaintiffs did not exercise due diligence to uncover their claims because "false price

reporting was epidemic and done openly in the industry." *Id*. The court noted a material difference between an allegedly unlawful practice engaged in openly within the industry and one outside of it. *Id*.

The *Issuer Plaintiff* court held that, because, in the Second Circuit, price-fixing claims are inherently self-concealing, the plaintiff was only required to allege that they were ignorant of the anti-trust violation. 2004 WL 487222, at *4. The *Issuer Plaintiff* plaintiffs pleaded that they had no knowledge of the alleged conspiracy and could not have reasonably discovered the alleged violation prior to that date. *Id*. at *5. The defendants responded that the underwriting fees at issue were available in public documents. *Id*. The court concluded that whether such information should have put a reasonable plaintiff on notice of possible collusion with respect to those fees is a fact. *Id*.

Given the differing standards used to define self-concealing wrongs in the Fifth and Second Circuit, *Allen Constr.*, it seems likely that the Fifth Circuit would conclude that the price manipulation was not inherently self-concealing. Defendants' purported manipulative activity included open market trading that they accurately reported. On the other hand, as noted above in the section discussing Rule 9(b) pleading, Defendants did take some steps to hide their activities. Regardless of the self-concealing nature of the wrong, however, a fact issue remains as to when Plaintiffs should have been on notice of their claims.

### 2. Affirmative Acts of Concealment

Where the wrong is not self-concealing, "[c]oncealment by defendant only by silence is not enough. The defendant must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry." *Allen Constr.*, 851 F.2d at 1528-29 (internal

citations omitted). For example, in the anti-trust context, if the defendants claimed that they were making unilateral decisions and publicly stated that they were horizontal competitors rather than that they were committing anti-trust violations, these acts do not constitute affirmative acts of concealment. *See, e.g. Rx.com v. Medco Health Solutions, Inc.*, 322 Fed. Appx. 394, 397-98 (5th Cir. Apr. 22, 2009) (not designated for publication) (applying *Allan Constr.* to affirm summary judgment).

Plaintiffs do not plead with particularity any acts Defendants purportedly took to wrongfully conceal their illegal conduct. (Pl. 2d. Am. Compl. ¶ 155: "Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about July 26, 2007.")

### 3. Plaintiffs' Diligence

Defendants argue that Plaintiffs' allegations imply that Defendants' HSC trades triggered inquiry notice and a duty to investigate a potential claim. Defendants note that Plaintiffs plead that HSC trading on several occasions during the Class Period resulted in decoupling from prices at nearby trading hubs as early as December 2003. Defendants contend that this decoupling was a "storm warning," triggering a duty to investigate further. Plaintiffs respond that whether market participants were put on inquiry notice and whether they then could have discovered the manipulation before the CFTC filed its complaint are questions of fact. Plaintiffs question whether it is reasonable to expect them to have observed the "decoupling" in the market when it was occurring.

In the CEA context, like for securities and antitrust law, a claim accrues when the plaintiff, in the exercise of due diligence, has actual or constructive knowledge that he

has been injured and who caused the injury, even where a defendant has concealed wrongful conduct. *See, e.g. Allen Constr.*, 851 F.2d at 1533; *Jenson v. Snellings*, 841 F.2d 600, 606-07 (5th Cir. 1988); *In re Copper Antitrust Litig.*, 436 F.3d 782, 788 (7th Cir. 2006) (holding that the district court improperly found that the plaintiff should have suspected a defendant's possible culpability based on news reports of a CFTC investigation regarding that defendant); *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 229, 240 (7th Cir. 1991) (internal citations omitted). A plaintiff who fails to make some inquiry after the "storm warnings" have given rise to constructive notice may not benefit from the tolling of the statute of limitations. *Staehr v. Hartford Financial Servs. Group, Inc.*, 547 F.3d 406, 426-27 (2d Cir. 2008). For inquiry notice to exist, the triggering information must relate directly to the conduct that the plaintiffs allege in their action against the defendants. *Id.* (internal citations omitted). The court should apply an objective, totality-of-the-circumstances approach to analyze whether the circumstances would suggest to an investor of ordinary intelligence the probability of fraud. *Id.* Summary judgment and motions to dismiss are often ill-suited to questions of constructive knowledge and inquiry notice. *See In re Sumitomo Copper Litig.*, 104 F.Supp.2d 314, 324 (S.D.N.Y. 2000). Only when the facts from which knowledge may be imputed are clear from pleadings and any public disclosures is dismissal appropriate as a matter of law. *Id.* (denying a motion to dismiss because the plaintiffs alleged that a defendant knowingly concealed its financing of manipulative positions, supported by an internal memo to this effect). In the antitrust context, plaintiffs have adequately alleged wrongs that were self-concealing based on a conspiracy to manipulate the market for physical copper and copper exchange contracts. *In re Copper Antitrust Litig.*, No. 99-C-

621-C, 2000 WL 34230131, at *22 (W.D.Wis. July 12, 2000) (dismissing the action because plaintiffs failed to plead diligence in uncovering the claim).

Here the CFTC filed its complaint alleging attempted manipulation of the natural gas market at HSC in July 2007. When the information in the public domain only contains reports of activities that are within the defendant's normal, non-illegal activities, a fact question exists as to when the plaintiff was put on inquiry notice of defendants' wrongdoing. *In re Copper Antitrust Litig.*, 436 F.3d at 790. On the other hand, in a case involving the manipulation of the silver market, the court found that the plaintiffs were put on inquiry notice of the fraudulent scheme because several other private lawsuits had been filed against the defendants based on similar conduct, public congressional investigations had commenced that scrutinized the activities of the defendants, and the media coverage was so substantial that the court observed that regular newspaper readers knew what the case was about. *See Korwek v. Hunt*, 646 F.Supp. 953, 959-59 (S.D.N.Y. 1986) (holding that the plaintiffs had not sufficiently alleged diligence to allow tolling based on fraudulent concealment). In the context of securities litigation, a sister court speculated that, while a Senate subcommittee investigation of the wrongdoing was insufficient to place a plaintiff on inquiry notice, the ultimate report of the subcommittee might have been sufficient to constitute inquiry notice. *See In re Enron Corp. Securities, Derivative & ERISA Litig*, H-01-3624, 2004 WL 405886, at *20 (S.D. Tex. Feb. 25, 2004).

The Court cannot conclude as a matter of law that Plaintiffs should have been on inquiry notice during Defendants' conduct. Plaintiffs allege that it would have been impossible to discover the unlawful conduct before the CFTC filed its complaint in July

2007. While this may not be the case, the Court cannot foreclose this argument as matter of law. Defendants reply that Plaintiff Calle-Gracey, who filed the *Natural Gas I* action in 2004, is apparently a sophisticated investor well aware of the type of conduct that could give rise to an alleged claim. The Court has found no authority to suggest that decoupling in the market, absent knowledge of the actors perpetrating this conduct, makes it clear that Plaintiffs were on inquiry notice. It finds this case much more similar to the *In re Copper Antitrust* case cited, *supra*, than the silver manipulation case, *Kowek v. Hunt.* Consequently, even if Plaintiffs wholly failed to plead fraudulent concealment with particularity, it is unclear that the claim accrued when Defendants' conduct took place such that Plaintiffs' suit is untimely.

Regardless, however, for the reasons stated above, the Court finds that Plaintiffs' have failed to state a claim for manipulation of the NYMEX futures market or the underlying Henry Hub natural gas market.

## IV.   CONCLUSION

Plaintiff's Motion for Reconsideration is **DENIED.**

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 26th day of August, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**